# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DIETRICH LAMONT ROBERTS, | ) |
| | ) |
| Plaintiff, | ) Civ. No. 13-721-SLR |
| | ) |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Angela Pinto Ross, Esquire of Doroshow, Pasquale, Krawitz & Bhaya. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Dina White Griffin, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Roxanne Andrews, Esquire, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: October *27*, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Dietrich Lamont Roberts ("plaintiff") appeals from a decision of Carolyn W.

Colvin, Acting Commissioner of Social Security ("defendant"), denying his application

for supplemental security income ("SSI") under Title II of the Social Security Act (the

"Act"), 42 U.S.C. §§ 401-434, 1381-1383f. The court has jurisdiction pursuant to 42

U.S.C. § 405(g).[1]

Currently before the court are the parties' cross-motions for summary judgment.

(D.I. 13, 15) For the reasons set forth below, plaintiff's motion will be denied and

defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff protectively filed an application for SSI on May 25, 2010 alleging

disability beginning on February 1, 2009, due to a bulging disc in his back, nerve

damage, and a slipped disc. (D.I. 11 at 182, 186) On June 24, 2011, after a hearing on

May 31, 2011, the ALJ denied plaintiff's claim, finding that plaintiff could perform a

range of unskilled, sedentary work. (Id. at 25-40, 42-86) After the Appeals Council

denied review (id. at 1-11), plaintiff filed the current action for review. (D.I. 13)

### B. Medical History

#### 1. Lower back pain

---

[1]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of
Social Security made after a hearing to which he was a party ... may obtain a review of
such decision by a civil action commenced within sixty days after the mailing to him of
notice of such decision. . .. Such action shall be brought in the district court of the
United States for the judicial district in which the plaintiff resides .... 42 U.S.C. § 405(g).

Plaintiff's medical history states that he "had sudden onset of left leg pain" while lifting furniture in 1997. He was evaluated and underwent pain management, but he refused injections at that time. He re-injured his back in 2002, was prescribed some medications and told that he might need surgery. He moved to Atlanta for a few years. Upon returning to Delaware, he was seen by a physician and was offered medical management and epidural steroid injections. Plaintiff refused any interventions. (D.I. 11 at 255)

On July 22, 2010, plaintiff completed a "function report" form in connection with his SSI claim, indicating he lived in an apartment with friends. He checked the box for "no problem" with personal care, but stated reaching and bending causes "severe pain" for "dress," "bathe," and "hair" care categories. He prepared "complete meals when pain subsides" twice daily taking thirty minutes to one hour. He indicated he went outside everyday, walked and took public transportation. He shopped in stores for food and clothes, once a month for two to three hours. He goes to meetings, social groups and church daily, but indicated that he did not visit friends as often as he used to. He can walk two blocks before needing to rest for twenty to thirty minutes. He can pay attention "all the time;" follows written and verbal instructions "very well;" gets along with authority figures "very good;" and handles stress "very well" and changes in routine "not so good." He states that he uses a "brace/splint" (not prescribed by a doctor) every day, but did not check the box for a "cane." (Id. at 191-198)

Portia Conix, D.O. ("Dr. Conix") provided treatment to plaintiff from May to August of 2010. (Id. at 232-253) On May 24, 2010, Dr. Conix's examination revealed that plaintiff had intact neurological findings, spinal tenderness and painful range of

2

motion, normal musculoskeletal findings, and normal strength and stability. Dr. Conix diagnosed plaintiff with chronic lower back pain, obesity, depression, anxiety disorder and high blood pressure. (Id. at 232) Later diagnoses included spinal stenosis. (Id. at 242) Plaintiff's medications were Percocet, Oxycontin, Valium and Xanax. (Id. at 232) Dr. Conix's later treatment notes state no changes in plaintiff's status. (Id. at 235-243)

On August 17, 2010, plaintiff underwent evaluation at Albert Einstein Pain Center. He complained of "lower back [pain] radiating down the left leg to the knee . . . particularly worse with prolonged sitting and standing as well as bending forward." (Id. at 255) Examination revealed plaintiff had a normal toe and heel walk that favored his left side, normal motor strength, normal light touch upon sensory examination, lumbar spine tenderness, positive straight leg raising on the right, positive Patrick's sign bilaterally, and limited thoraco-lumbar flexion/extension with pain. Plaintiff also had normal affect and intact memory. The examining pain management specialist, Jasmeet Oberoi, M.D. ("Dr. Oberoi"), diagnosed lumbar spinal stenosis and lumbar radiculopathy. Plaintiff's August 2008 MRI showed multilevel degenerative disc disease and lumbar spondylosis causing significant central and foraminal narrowing, particularly on the left at the L4-5 level and L5-S1 level, and displacement of the left S1 exiting nerve root. Dr. Oberoi recommended a treatment plan including epidural steroid injections and medication (Percocet, Motrin, and nortriptyline). Dr. Oberoi also noted a possibility of surgery. Plaintiff refused to consider the injections or surgical options. (Id. at 255-260)

On August 26, 2010, the Commissioner scheduled a consultative physical

3

examination by Leonard Popowich, D.O., an internist; plaintiff did not attend. (Id. at 311)

Dr. Conix referred plaintiff to Cindy Feaster, P.T. ("Ms. Feaster"), a certified work capacity evaluator with Progressive Rehab, LLC, for treatment and evaluation of his spinal stenosis in August 2010. (Id. at 280) Ms. Feaster prescribed moist heat, electrical stimulation, neuro re-education, and a home exercise program. (Id. at 279) Ms. Feaster treated plaintiff on five occasions from August 18 to August 27, 2010. (Id. at 270-74) On September 20, 2010, Ms. Feaster filled out a functional capacity form (checking boxes without comment) indicating that plaintiff occasionally could lift up to ten pounds and carry up to twenty pounds; stand/walk for one hour or less and sit for one-half hour at a time in an eight-hour work day; was limited in his ability to push/pull with his lower extremity; occasionally could kneel and balance; never could bend, stoop, crouch, or climb; and had limitations regarding other physical functions like reaching, handling, seeing, hearing, speaking, tasting, and smelling. (Id. at 281-82) Ms. Feaster also reported that plaintiff had reduced range of motion in hip flexion, lumbar flexion, and flexion-extension. (Id. at 284)

Plaintiff received treatment at Quality Community Health Care ("QCHC") for his lower back pain.[2] (Id. at 314-54) QCHC providers prescribed Percocet and Soma for his lower back pain. His medication sheet also includes Gabapentin. (Id. at 354) The providers diagnosed spinal stenosis, radiculopathy, peripheral neuropathy and hypertension. (Id. at 321, 330, 332) On September 13, 2010, plaintiff reported relief of

---

[2]Plaintiff's bloodwork notes a Leila Hardware ("Dr. Hardware") at QCHC.

his back pain with Percocet. (*Id.* at 325) On October 18, 2010, plaintiff requested an increase in his Percocet; the physician discussed the dangers of taking large amounts of narcotics. (*Id.* at 327) On January 10, 2011 and February 7, 2011, plaintiff reported that the Percocet helped with his back pain. (*Id.* at 335, 339) On March 4, 2011 and April 4, 2011, plaintiff denied having any acute issues. (*Id.* at 341, 345)

On September 22, 2010, Paula Vanscoy ("Ms. Vanscoy") performed a physical residual function capacity ("RFC") assessment of plaintiff, finding that plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk for about six hours in an eight-hour work day; was unlimited in his ability to push and/or pull; occasionally could use ramps, climb stairs and ladders, bur should never climb ropes or scaffolds; could frequently balance and stoop; occasionally kneel, crouch and crawl; and had no limitations regarding other physical functions like reaching, handling, fingering and feeling; no visual or communicative limitations; and should avoid concentrated exposure to vibration. These findings were based on plaintiff's allegations, medical records, and treatments received. (*Id.* at 305-310)

A lumbar spine MRI on April 26, 2011 showed multilevel degenerative changes, most pronounced at the L5-S1 level where there is severe bilateral neural foraminal stenosis and mild central canal stenosis. (*Id.* at 355-56)

### 2. Mental health treatment

After an intake biopsychosocial assessment on August 16, 2010, a QCHC therapist, Jake Wayne, diagnosed general anxiety disorder ("GAD"), depression,

5

unresolved grief, and assigned plaintiff a Global Assessment of Functioning ("GAF")
scale score of 48. Plaintiff's substance abuse history included heroin, alcohol, and
cocaine. (Id. at 358-62) On September 24, 2010, Lewis Merklin, M.D. ("Dr. Merklin")
examined plaintiff noting plaintiff's past heroin addiction and that plaintiff was still
mourning his mother's death three years earlier. Dr. Merklin's examination revealed
normal findings, but mild anger, moderate anxiety and irritable mood and moderate
depression. Plaintiff had normal attention and concentration and exhibited normal
behavior. Dr. Merklin diagnosed GAD and heroin dependence by history. He
recommended outpatient therapy for anxiety and depression, and prescribed Xanax.
(Id. at 363-369) The QCHC providers continued to prescribe Xanax through May 2011.
(Id. at 372, 375, 379, 382-84) Plaintiff did not report side effects, nor did the QCHC
providers observe any. (Id. at 377-78, 380, 382) The treatment notes state the
following. On October 14, 2010, plaintiff was doing well on his medications and had no
complaints or adverse medication side effects. (Id. at 380) On November 19, 2010, he
was doing well on the current regimen and benefitting from physical therapy. (Id. at
382) On December 16, 2010, he was doing well and had no complaints or adverse
medication side effects. (Id. at 378) On February 10, 2011, he had no complaints or
adverse medication side effects, but was concerned about the possibility of being
bipolar. The Xanax helped with anxiety and nail biting, and he felt angry during the day.
(Id. at 376) On November 19, 2010, he was doing well on the current regime and
should ask about an increase in his dose of Neurontin for relief of his neuropathy. (Id.
at 382) On March 17, 2011, he was doing well on his medications and had no

6

complaints or adverse medication side effects. (Id. at 374) On April 15, 2011, he was stressed due to "lots of things going on" and had no adverse side effects. (Id. at 373) On May 12, 2011, he was doing well, again with no adverse side effects. (Id. at 371)

Mark Hite, Ed.D., a state agency expert, reviewed plaintiff's file in September 2010 and opined on a Psychiatric Review Technique form that he did not have a medically determinable impairment. (Id. at 292) Dr. Hite explained that plaintiff alleged depression and anxiety, but was not receiving any type of mental health intervention nor was he prescribed any psychotropic drugs. (Id. at 304) Dr. Hite cited Dr. Conix's report of August 18, 2010, stating that plaintiff had intact judgment and normal orientation, mood, and affect, and the evaluation from the Albert Einstein Medical Center of September 16, 2010, indicating that plaintiff had a normal affect and intact memory, and was fully oriented in all spheres. (Id. at 304)

## C. Administrative Hearing

### 1. Plaintiff's testimony

An administrative hearing was held on May 31, 2011. (D.I. 11 at 44-86) Plaintiff appeared, represented by counsel. Plaintiff completed eleventh grade[3] and can read, write and do basic math. (Id. at 46-47) He is 5'10" and weighs 217 lbs. He purposefully lost weight in the last five-and-a-half months ago, from 243 lbs. (Id. at 62) He was living in a house with his wife and kids until the divorce. (Id. at 73) He then lived in an apartment with some friends and lived with a family member. In those arrangements, he had to fend for himself, doing some cooking. (Id. at 74) For the past

_____

[3]The disability report indicates 10th grade. (D.I. 11 at 186)

7

two months, he has lived at a shelter, the Outley House. Although there is a chore list, he does not have to do any, because of the pain and medications. (*Id*. at 72-74)

He has not worked since May 2010. He worked as a cook about 15 years ago and as a mover. He worked as a full-time asbestos worker from 1998-2003, removing asbestos, which bags weight about 50-100 lbs and was on his feet more than half the time. He "worked produce" in 2003, unpacking and putting out the inventory. The heaviest produce weighed 50-100 lbs and plaintiff was on his feet "most of the time." (*Id*. at 47-49) When asked if he believed he could work doing anything full-time, plaintiff testified that he could not work because "one wrong turn, one wrong bend and my back is out of order, muscle spasms . . . ." (*Id*. at 50) When asked if he could do jobs where he "really wouldn't have to do heavy lifting and even be on [his] feet a lot," he responded, "[w]ell, right now, no, because they had me basically standing for a half an hour and sitting every 15 minutes." (*Id*. at 50-51) When asked if he could "actually only stand out of an eight hour day for a half an hour," plaintiff did not directly respond, stating "as bad as I want to work I can't work." (*Id*. at 51-52) When asked if he could work at a job, where he could sit and stand when he wanted, without lifting, plaintiff responded that "no," because he is not comfortable being on the clock and "one little slip one little wrong way [he's] done." (*Id*. at 77)

Plaintiff testified he is doing "nothing" right now. He reads, goes to the library, and takes walks for no more than an hour, at least three or four times a week. (*Id*. at 53-54, 69) He takes a nap after lunch for 45 minutes to an hour, "because the pain kicks in." (*Id*. at 69, 76-77) His day is centered around "taking [his] medicines for blood

8

pressure and nerves. (Id. at 54) He is going to start getting injections in his back, which is "even more reason for [him] not to be active." (Id. at 54)

Plaintiff testified that he divorced over his lack of work and that: "[M]y wife for the beginning of the situation when it first happened she thought that It was okay, you're putting the system on. But it's no longer now you're putting the system on, you know, it's like okay, now you can't perform." (Id. at 52) When questioned further, he explained that for his wife, it was a money issue and she thought, "[he] could go out and [he] could still work because you're looking at an able body on the outside but the inside [he is] messed up." (Id. at 61) Plaintiff received Worker's Compensation in 1997-1998 and 2003. He received a lump sum, but left his "medical open." (Id. at 61)

Plaintiff testified that sitting too long or standing in the wrong position causes him pain. (Id. at 54) Laying down too much also causes pain. (Id. at 71) He can sit for fifteen minutes at a time, but tries to do so for half an hour; however, he is in pain if he sits for the half an hour. (Id. at 72) He uses a cane all the time, because it helps him keep "a balance in [his] back." (Id.) It was not prescribed, but was suggested by his psychiatrist, Dr. Merklin. (Id. at 76) His left leg also hurts, it "tingles" and "throbs." (Id. at 72) He testified that only lying down in bed and taking pain medications "subsides [his] pain." (Id. at 53) He also testified that medication is the only thing that "relaxes" him to take the pain away. (Id. at 69-70)

He attends NA meetings. He was abusing cocaine and alcohol. His clean date is February 21, 2010 and he is not currently having an issue with his substance abuse. (Id. at 74)

9

Plaintiff has been under the care of his primary physician, Dr. Hardware at QCHC, since the beginning of the year and just started seeing Dr. Prokop at Hahnemann Hospital.[4] (*Id*. at 55, 57) Dr. Conix (plaintiff's primary physician until she retired) requested he go to the Albert Eienstein Pain Center, but the center did not "want to take [him] on to keep [him] on a pain medication" at his current limitations. (*Id*. at 55, 57) The center evaluated him, but did not want to prescribe his pain medication. (*Id*. at 56) Dr. Hardware wants someone else to handle plaintiff's pain medication. (*Id*. at 57) Plaintiff had a nerve study done in Delaware in 1998; he states he has "50 percent nerve damage." (*Id*. at 59-60) He had an MRI in 2008 and just received another MRI. (*Id*. at 58) He has also been treated by a physical therapist. (*Id*. at 67-68) Plaintiff states that his current treatment plan is to start receiving the injections, with Hahnemann handling all his pain medication, then surgery will be considered. (*Id*. at 60)

Plaintiff started receiving pain management in 1997 after he was injured. (*Id*. at 58) He has been on medication, oxycontin 80 mg, since 1997, prescribed by several doctors. (*Id*. at 58-59) He switched to Percocet, which "is not really helping," so his doctor is trying "to get [him] in pain management." (*Id*. at 59) Plaintiff also takes Soma, a muscle relaxer. (*Id*. at 72)

Plaintiff has depression and has been treated by a psychiatrist[5] (for about nine months) and a therapist (for over a year, twice a month). (*Id*. at 62-63, 65) He takes

_____

[4]There are no records from Hahnemann.

[5]He states Jane Brown is his psychiatrist, but the records are from Dr. Merklin.

10

Xanax and used to take Valium. (*Id.* at 63, 65-66) He testified he was diagnosed with bipolar disorder by his therapist Jake Wayne. (*Id.* at 64) He last saw his psychiatrist one month ago. (*Id.* at 64) Plaintiff testified that his mental health affects his ability to work. (*Id.* at 67) His physical condition makes him more depressed because of his inability to do things. (*Id.* at 67)

Instead of describing his side effects, plaintiff answered that he took Xanax, because he was hyper, and if he did not take his Percocet, he had "withdrawals, sweats, chills . . . ." (*Id.* at 70) If he takes his medication, plaintiff testified he has "nodding, incoherent, scratching, itching, you name it." (*Id.* at 71)

### 2. VE's testimony

At the hearing, the VE testified that plaintiff's vocational background consisted of work as a furniture mover from 1992 to 1997, a very heavy occupation, with a special vocational preparation ("SVP") of 3 (DOT number 904.687-010); a line cook from approximately 1995 to 2009, a light occupation, semiskilled, SVP 3 (DOT 313.374-014); an asbestos removal worker from 1998-2003, a heavy occupation, unskilled, SVP 2 (DOT number 869.684-082); produce clerk for a year, heavy occupation, semiskilled SVP 4 (DOT number 299.367-014). (*Id.* at 78-79)

The ALJ posed the following questions to the VE:

> ALJ: Let's assume I find the claimant limited to work lifting and carrying no more than 20 pounds occasionally, 10 pounds frequently; standing and walking up to 6, sitting up to 6 hours; no climbing of ladders, ropes or scaffolds; no more than occasional — I'm sorry, ladders, ropes or scaffolds; no more than occasional using of stairs, using of ramps and climbing stairs; no more than occasional balancing, stooping, kneeling, crouching and crawling; need to avoid exposure to vibration, concentrated exposure to vibration, as well as hazards including moving machinery and

unprotected heights; also, limited to work involving simple, routine tasks; short, simple instructions; simple work related decisions with few workplace changes. Could he perform his past work?

VE: No, that would eliminate all of the work.

ALJ: Would there be other work available?

VE: There would be other positions available, yes. And I can give you some examples at light.

. . .

. . . Hospital product assembler, that is light, it is unskilled, SVP: 2, the DOT number is 712.687-010, local numbers approximately 250 positions and then nationally about 40,000. Another similar position would be a hand packager and inspector, the DOT number is 559.687-074, it is light, unskilled, SVP: 2, local numbers would be about 550 positions and then nationally about 50,000. Another example would be a garment folder, the DOT number is 789.687-066, it is light, unskilled, SVP: 2, local numbers about 500 positions, nationally about 50,000.

ALJ: All right, so now if we were to add the need for a sit/stand at will, would there be work available at the light exertional level?

VE: Yes, I think the same positions.

ALJ: Same numbers?

VE: And the same numbers. This is not covered by the DOT, but these are positions that typically would allow for sit or stand.

ALJ: Okay. Now, if we were to shift to the sedentary exertional level with the same limitations, so just basically change lifting and carrying to no more than 10 pounds occasionally; standing and walking up to 2, sitting up to 6 with all the same additional limitations, though to my prior hypothetical, would there be work available?

VE: At sedentary, yes. For example, a table worker, which is a sedentary inspector of small products, unskilled, SVP: 2, DOT number 739.687-182, local numbers about 500 positions, nationally about 50,000. Another example would be a final assembler for optical goods, the DOT number is 713.684-014, and it is sedentary, unskilled, SVP: 2, the local numbers would be about 2000 positions and nationally about 30,000. Another example of a sedentary position would be a cuff folder, a folder for

12

textiles, DOT number 685.687-014, and it is unskilled, SVP: 2, local numbers about 500, nationally about 50,000.

ALJ: Okay. All right, then now can you tell me what are the permissible breaks?

VE: Usually a 10 to 15 minute break in the morning, a 10 to 15 minute break in the afternoon and a lunch break of 30 to 60 minutes, depending on the employer.

ALJ: Okay. Now, if an individual required unscheduled breaks at will, would there be work available?

VE: No.

ALJ: If a person were off task more than 10 percent on a consistent basis in addition to allowable breaks, would there be work available?

VE: No, they wouldn't be able to maintain.

ALJL And if a person were not able to sit, stand and walk a total of eight hours, would there be work available?

VE: No.

(*Id.* at 78-81)

Plaintiff's counsel did not cross-examine the VE, but stated that:

[B]ased on the MRI showing that [plaintiff] does have multi-level degenerative changes, most pronounced at the L-5, S-1 level where it's noted that he has severe bilateral and neuroforaminal stenosis. There was the RFC that was completed by the physical therapist that examined him at Progressive Rehab Centers that put him at a less than sedentary level. And also based on his testimony, the need for laying down throughout the days would not – I guess to avoid having to take his medication – if he was not taking his medication he would need to lay down throughout the day, which would account for unscheduled breaks, and if he was not laying down and taking his medication to deal with the pain he testified to the fact that the side effects do have him out of it and not able to concentrate, which would have him off task more than 10 percent during the day. I believe that either one of those ways to help him cope with the pain would have him functionally less than sedentary level.

(*Id.* at 82)

13

## D. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that the plaintiff was not disabled as of May 25, 2010. (*Id.* at 36) The ALJ's

findings are summarized as follows:[6]

1. The claimant has not engaged in substantial gainful activity since May 25, 2010, the application date (20 C.F.R. §§ 416.971 et seq.).

2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; hypertension; obesity; generalized affective disorder;[7] and heroin dependence by history (20 C.F.R. §§ 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except requiring a sit/stand option at will; no climbing of ladders, ropes or scaffolds; no more than occasional climbing of stairs and ramps; and no more than occasional balancing, stooping, kneeling, crouching, and crawling. The claimant should also avoid concentrated exposure to vibration and hazards, including moving machinery and unprotected heights. He is also limited to simple, routine tasks based on short, simple instructions, with only simple work-related decisions and few workplace changes.

5. The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

6. The claimant was born on September 24, 1972 and was 37 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 C.F.R. § 416.963).

7. The claimant has a limited education and is able to communicate in

---

[6]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

[7]The court notes that plaintiff's diagnosis referred to by the ALJ in his rationale is generalized anxiety disorder. (D.I. 11 at 34)

14

English (20 C.F.R. § 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 C.F.R. §§ 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Act, since May 25, 2010, the date the applicaiton was filed. (20 C.F.R. § 416.920(g)).

(Id. at 28-37)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of

"evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his

conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

17

work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(1) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. See 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC

18

to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v . Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to h[er] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On June 24, 2011, the ALJ found that plaintiff was not under a disability within the meaning of the Act from May 25, 2010. The ALJ concluded that, despite plaintiff's severe impairments (degenerative disc disease of the lumbar spine, hypertension,

19

obesity, generalized affective disorder, and heroin dependence by history), as of May 25, 2010, he had the residual functional capacity to perform sedentary work, except that he required a sit/stand option at will; could not climb ladders, ropes or scaffolds; could only occasionally climb stairs and ramps; and could only occasionally balance, stoop, kneel, crouch, and crawl. Plaintiff should also avoid concentrated exposure to vibration and hazards, including moving machinery and unprotected heights. He is also limited to simple, routine tasks based on short, simple instructions, with only simple work-related decisions and few workplace changes. After considering the VE's testimony, the ALJ concluded that, while plaintiff could no longer perform his past work, there were a significant number of other jobs in the national economy, including hospital product assembler, hand packager and inspector, and garment folder, at the light exertional level, as well as table worker, final assembler and cuff folder at the sedentary exertional level.

Plaintiff contends that the ALJ erred in giving plaintiff's treating physical therapist's opinion "little weight," failed to address all of the relevant evidence, and specifically failed to address plaintiff's GAF score of 48. Defendant disagrees and contends that substantial evidence supports the ALJ's decision that plaintiff was not disabled under the Act as of May 25, 2010.

### 1. Lower back pain

Plaintiff argues that the ALJ erred in giving "little weight" to Ms. Feaster's medical source statement ("statement") and did not sufficiently explain her reasoning. Plaintiff specifically disagrees with the ALJ's assessment of plaintiff's RFC, because it differs from the statement, which indicated that plaintiff could stand/walk one hour or less in an

eight-hour day, sit one-half hour and could never stoop. Plaintiff alleges that such statement is consistent with Dr. Oberai's findings regarding plaintiff's lower back pain.

The ALJ analyzed plaintiff's daily activities and determined that they were not limited to the extent expected, given plaintiff's description of his disabling symptoms and limitations. Plaintiff described being able to take care of his personal needs, go outside daily, take walks, go to the library, regularly attend meetings and use public transportation. The ALJ noted plaintiff's use of a cane (albeit not prescribed) and testimony that he could only sit for thirty minutes at a time. The ALJ concluded that plaintiff's treatment has been routine and conservative.

The ALJ noted that the objective evidence shows plaintiff has degenerative changes and severe stenosis, but treatment notes indicate that he has reported relief with medication. The ALJ stated that plaintiff "was treated by a physical therapist but did not see a medical professional for rehabilitation." As to opinion evidence, the ALJ considered the residual functional capacity conclusion of Paula Vanscoy, but found that plaintiff was more limited based upon the record at the hearing level. The ALJ considered the medical source statement completed by Ms. Feaster, noting the assigned limitations of sitting/standing and walking for a total of one and a half hours in an eight hour day. The ALJ concluded that "the medical evidence of record as well as the claimant's daily activities do not support the identified limitations." The ALJ afforded "little weight" to Mr. Feaster's opinion as it was inconsistent with the record at the hearing level. The ALJ further found that plaintiff's statements that he is completely unable to work are not supported and are no more than fairly credible in light of the discrepancies with plaintiff's testimony and documented daily activities.

While plaintiff complains that the ALJ "incorrectly implies that Ms. Feaster is not a medical professional since she provided rehabilitation services," Ms. Feaster is properly considered an "other source" by the SSR 06-03p and 20 C.F.R. § 416.913. The ALJ reasonably considered Ms. Feaster's evaluation, which was provided after Ms. Feaster treated plaintiff in August 2010, with five appointments over one and a half weeks, from August 18 to August 27, 2010. The ALJ afforded Ms. Feaster's evaluation "little weight" as it was inconsistent with the record at the hearing level.[6] Plaintiff's treating physicians noted normal strength and stability, as well as normal toe and heel walk that favored his left side, with normal motor strength. The ALJ specifically questioned the VE regarding jobs where plaintiff could sit/stand at will.

Plaintiff argues that the ALJ did not consider all of the relevant evidence, specifically pointing out that the ALJ did not mention plaintiff's testimony that he will be starting injections and that Dr. Oberai recommended epidural steroid injections and possible surgery. Plaintiff fails to note that he refused both of these treatment options. The ALJ properly summarized the medical records, including plaintiff's complaints and the medical opinions in making his RFC determination. *Fargnoli*, 247 F.3d at 42 (The ALJ need not "make reference to every relevant treatment note," but should, "as the

_____

[6]Plaintiff cites to *Corson v. Astrue*, Civ. No. 10-236-E, 2012 WL 726885 (W.D. Pa March 6, 2012) for support that the ALJ erred in failing to explain inconsistencies with a Functional Capacity Evaluation report by a physical therapist. However, in *Corson*, the ALJ rejected the only piece of medical evidence that directly related to plaintiff's ability to sit (a detailed written account by a physical therapist, stating that plaintiff could only tolerate functional sitting of 10 to 15 minutes) finding instead that plaintiff could sit for six hours a day. The physical therapist's opinion was consistent with plaintiff's testimony, physical demeanor at the hearing, and plaintiff's daily activities. *Id*. at *4-5.

factfinder, . . . consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.")

Plaintiff argues that the ALJ discounted his reports of pain. The ALJ considered plaintiff's testimony regarding his inability to work and found that these were "no more than fairly credible in light of discrepancies between [plaintiff's] assertions and information contained in the documentary reports." The ALJ concluded that plaintiff's testimony was not supported by the medical evidence of record. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (the ALJ "must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work, . . . requir[ing] the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). Plaintiff reported relief with the use of medication on more than one occasion.

### 2. Mental health

Plaintiff alleges that the ALJ's failure to cite plaintiff's GAF score of 48 requires remand. In evaluating plaintiff's mental impairments, the ALJ noted plaintiff's treatment over nine months, Xanax prescription, diagnosis of generalized anxiety disorder and heroin dependence by history, and lack of side effects. While the ALJ did not specifically cite plaintiff's lone GAF score (noted by plaintiff's therapist, not plaintiff's treating physician), such omission does not necessarily require remand. The ALJ correctly noted that plaintiff reported an inability to work because of "his bulging disc, nerve damage, and slip disc." In three non-precedential opinions, the United States Court of Appeals for the Third Circuit discussed the applicability of a claimant's GAF

23

score to the disability analysis. *See Rios v. Comm'r of Soc. Sec.*, 444 F. Appx. 532 (3d Cir. 2011); *Gilroy v. Astrue*, 351 Fed. Appx. 714 (3d Cir. 2009); *Irizarry v. Barnhart*, 233 Fed. Appx. 189 (3d Cir. 2007). In *Rios*, the record contained three GAF scores, of which the ALJ discussed two. The Court held that remand was not warranted as the ALJ's judgment that plaintiff's RFC was limited by his impairment aligned with the treatment notes. *Rios*, 444 F. Appx. at 534-35. In *Irizarry*, the Court remanded the case when plaintiff was treated by three physicians, each of which assigned a GAF score, and the ALJ only discussed the highest GAF score. The ALJ did not discuss the two lower GAF scores or the corresponding treatment notes. *Irizarry*, 233 Fed. Appx. at 192. In *Gilroy*, the ALJ made "repeated references to observations" from the psychiatrist's report, but did not specifically reference the "one-time" GAF score of 45. The Court held that failure to specifically address the single GAF score was not error, as the ALJ properly explained plaintiff's limitations and the psychiatrist "did not express any opinions regarding specific limitations." *Gilroy*, 351 Fed. Appx. at 716. In the case at bar, plaintiff did not allege limitations with regard to his mental impairment, nor did his treating providers make any note thereof. While the ALJ's summary is brief, such discussion along with the analysis of plaintiff's daily activities and testimony, suffices to support the ALJ's RFC determination.[9]

The ALJ considered all the relevant evidence and adequately discussed the

---

[9]To the extent plaintiff relies on the GAF score to require a finding of disablement, plaintiff's therapist Jake Wayne is considered an "other source" and his report alone can not establish disability. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); SSR 06-03p ("Information from these "other sources" cannot establish the existence of a medically determinable impairment, [but] . . . may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.")

bases for her RFC determination in her findings and evaluation of the evidence. The court concludes that a careful review of the entire record provides substantial evidence, sufficient to support the ALJ's finding that plaintiff could perform a limited range of light work and that jobs existed in significant numbers in the national economy that he could have performed, and that he was not disabled as of May 25, 2010.

## V. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate order shall issue.